Thank you, Judge Friedland. May it please the court, Andrew Birney on behalf of the United States. I'll keep an eye on my clock and try to reserve two minutes for rebuttal. This court should reverse on all four of the issues presented in this interlocutory appeal. First and most fundamentally, the district court erred in concluding that the 1900 Act categorically bars the United States from disposing of the lands under FLTMA or otherwise. As a textual matter, the 1900 Act simply opened the lands to disposition under the broad categories of land disposal authority then in existence. FLTMA then superseded and replaced that patchwork of laws with a uniform land disposition scheme that applies to all public lands, including, undisputedly, the lands at issue here. Under the reference canon and common sense, FLTMA thus serves as the modern version of the categories of authority identified in the 1900 Act. And I want to- So FLTMA, though, says we're not doing implied repeals and actually lists a bunch of statutes that it does repeal and this is not one of them. Right, so I don't think any of our arguments depend on implied repeal for two reasons. First of all, our argument is that, for two reasons. One argument we emphasize and the other argument Simplot emphasizes. I mean, for one, we think our argument is consistent with the 1900 Act under the reference canon. But also, even if the court were to find that the 1900 Act couldn't be applied here as a source of authority, there's no implied repeal necessary in interpreting FLTMA as a subsequent statute, as an independent source of authority, since it undisputedly applies to all public lands. So why did FLTMA list a whole bunch of statutes it was repealing that were about public land transfers, then? Because I think it may have been necessary to repeal those statutes, but it's not necessary here because, as an independent source of authority, it's not an implied repeal. And I think this Court's decision in the Blackfeet Indian Tribe versus Montana Power Company in 1988 case is particularly instructive on this point. There, you had a 1904 statute granting rights of way for a period not to exceed 20 years, and then you had a subsequent statute that granted allowed rights of ways for general purposes, without any time limitation. And this Court first said there was no implied repeal, but then it also said that there was no bar to interpreting both as independent source of authority. I mean, a corollary of the case, there was a different whole method because the tribe had to approve it. And so it's like, one is a system where tribe approves, and the other is some automatic system. And they're different. But here, there is no difference like that. I guess I thought the two statutes in that case both required tribal approval, but fair enough. But I think the more general point is that one of the corollaries of implied repeal doctrine, and the reason why there's a presumption against implied repeals, is we try to interpret statutes to coexist. And here, it's perfectly possible to read the two as coexisting. They're different sources of authority. But I want to emphasize that our primary argument that doesn't depend on FLTMA is just that this is perfectly consistent with the 1900 Statute Act because FLTMA serves, under the reference canon, as the modern sources identified in the act. And one thing I want to emphasize, Your Honor. How do you do that textually? I never understood that. So you're reading like timber, land, stone, and then that's FLTMA? No, well, so it says homestead, townsite, stone, and timber, and mineral. I mean, FLTMA expressly repeals the homestead and townsite actions to substitute for that. FLTMA's definition of multiple use includes timber and minerals. It also repealed the Mining Act of 1872. So FLTMA is expressly designed as a substitute for this and other patchwork sets of laws. So it's designed as a substitute. And it's not just FLTMA, Your Honor. I mean, I think this is the only interpretation that's consistent with the 1900 Act as well. It's undisputed. I mean, I think your first argument is much better. They're just simply two tracks of dispossessing land. You could either dispossess it under the 1900 Act, or you could dispossess it under FLTMA. It's as simple as that. I mean, not that hard. So it sounds like, Your Honor, that you like the argument that Simplot emphasized in their brief more than the argument we emphasized in our brief. OK, I appreciate your candor. I mean, we don't have a problem with that. We advanced a somewhat more narrower argument based on the 1900 Act. But if pressed, I think we would agree. How is that a narrow argument? Because it requires you to make some linguistic gymnastics to get there. No, I mean, fair enough, Your Honor. I mean, I don't think we'd have a problem with a ruling based more generally on FLTMA. I mean, FLTMA does conclude an exception to the definition for public lands for lands that are held in trust for Indians, which is not the case here. So I don't think we would have a problem with a ruling based on FLTMA, but we did have an argument based on the 1900 Act. I mean, I know this is sort of their argument, but what does only mean under that reading? I think there's no legislative history. I think only can plausibly mean two things, and they both point in basically the same direction. So I mean, for one, the argument is it modifies the United Applies to Disposition. You're shaking your head, Judge Boone. I didn't like that one either. OK. All right. Well, your body language wasn't good. But I mean, just to defend that a little bit, I mean, I think that the next, I mean, arguably it wasn't needed. I mean, the next sentence, the not, actually, I think it's the same sentence right after that. It says certain land is to be held in school districts according to the law of Idaho. So it's possible this, but the other reason, which we didn't really brief, I think this story is told particularly well in the National Mining Association amicus brief, was that in the late 19th century and early 20th century, there were all sorts of concerns about fraudulent sort of non-statutory transfers that didn't follow federal law and didn't give settlers a chance to acquire the land. So maybe that was the purpose. If that was the purpose, I don't understand why I didn't say something more general, just like all federal land transfer laws or all valid laws or something. Fair enough. I mean, Congress could have done that. I mean, to be candid, I think the best evidence is that's what Congress intended. I know it's subsequent legislative history, which perhaps isn't of great value, but just three years later when they repealed the public auction requirement, Congress, in a 1903 House report, described this 1900 statute as allowing for disposition under the general laws of the United States. So I think that is what Congress intended. But I think that Congress just spelled out. Why did they do that next amendment if this just was like you can do anything, any federal valid law? Well, I think the 1900 Act did apply a public auction requirement. So what I'm talking about is the 1904 Act that removed the public auction requirement. My point is, in the legislative history of that Act, and just in describing the 1900 Act, they described it as allowing for disposition under the general land laws of the United States. So my point is, I think they, the point is, but by all indications, they listed it out. But by all indications, they listed it out, like all the major sources of land disposition authority then in existence. And I think whether, to Judge Bumate's point, maybe whether you go as simple as. Wait, is that even true? Weren't there also like desert laws and other laws? I thought that isn't actually all of the kinds of laws that existed at the time. It might not be literally all of them, but I think it was the major sources of laws and the indication, just from that legislative history at least, is that it was intended to be comprehensive. We certainly don't have any indication that Congress intended this to be limiting in any way. And just on the purpose of the 1900s. Well, except the word only. Right. And I've offered various reasons about, and I think the federal law or the fraudulent transfers could be reasons. It's possible that only wasn't necessary and didn't do much work. But in any event, just to. Would you agree that only can't mean that future Congresses can't create a separate system for dispossessing land? I'm sorry, could you repeat that? Only in the 1900 Act can't mean that future Congresses are precluded from creating different legislation, different tracts for. That's right. Not just as a matter of law, but as the Supreme Court is repeatedly clear in the Marcello versus Bounds case in Dorsey, that one Congress lacks the power to impose that sort of clear statement requirement on another Congress. I mean, the question is whether. If Flipman had listed this law with the list of laws it was repealing, then we wouldn't have this case, I think.  The problem is they didn't. Right. And I think that the point is, Your Honor, we have been very clear in the district court and here that none of our arguments depend on implied repeal. We think this is consistent with the Act. And we think that applying a subsequent source of more general authority that concededly applies to all public lands is perfectly consistent, does not require an implied repeal. The 1900 Act is still in force until Section 4 of the Act, for example. They still had rights under that before the land was transferred on the domain. Because none of our arguments argue that it's not in the books. It's just that this land exchange is consistent with that. And to the extent it's not, Flipman is an independent source of authority. But do you understand, I mean, the 1900 Act doesn't impose procedural requirements on future Congresses, right? There's no issue of it being invalid in some way under the cases that say you can't bind a future Congress to different ways of enacting statutes. No, no, no. I'm sorry. My point was, to the extent the 19th, and I think this goes more to the Flipman independent source of authority, Your Honor. Like, to the extent the 1900 Act could be read as saying to apply new source of authority, Congress has to apply a clear statement. I don't think the 1900 Act says that. But to the extent it says that, my point, I thought I was trying to be responsive to Judge Bumate's question. One Congress can't impose that requirement on another. I do want to just make one, I know we're talking a lot about tax. Can I make one more textual question? Like, what does notwithstanding any other provision of law in Flipman do, then? So that's in 1715a. I mean, I think it emphasizes. So there's two things. In 1715a, it says notwithstanding any source of law. I think that means Flipman, there is authority to do exchanges, notwithstanding any source of law that would stand in the way. And I would also note that this is. So that would suggest that they're creating independent tracts. Yes. I think that's right. And also 1716b, when it refers to land held by BLM, says dispose of lands under this act, which implies that it's an independent source of authority at all, as well. I just don't understand. So Flipman also says, nothing in this act shall be deemed to repeal any existing law by implication. And then it lists the ones that it does repeal. And I don't understand where the space between that leaves, how saying those two things leaves the option that it just, that this law doesn't need to be repealed. If it's going to, the only in this other law doesn't need to be repealed for Flipman to affect it. Because it has this thing, nothing shall be deemed to repeal existing law. And then it lists the ones it is repealing. The 1900, I mean, I'm not sure I can prove on my previous response. I mean, the 1900 Act has not, we don't believe it has been repealed. It is still in force. And so then you're saying that this transfer was either mining, stoning, which one is it? I don't think it was any of those. It was under a statute that serves as the successor to those broad categories of authority. Remember, Your Honor, when the 1900 Act was passed, I don't think land exchanges were even authorized under any statute. I could be wrong about that. But I think the Taylor Grazing Act in the 1930s was the first statute that authorized land exchanges. So it's not exactly the subject matter of those sources of authority. And again, this is the first argument, not the argument about Flipman as an independent source of authority. But it's the successor source of, it's the successor to these broad categories of law that Flipman, we think, in repealing and replacing them was clearly designed as a replacement. I do, and I know I'm over my time, I do want to make one point. We are talking about text. And text is important as a good textualist. But I think the statutory purpose point is important too. One really striking thing about this case, and I'm a little biased, obviously, but as I read the briefs, no one has articulated any plausible theory by which Congress would have intended in 1900 or 1976 to make these lands immune from disposition. Now, sometimes unintentional statutory black holes might be created if the court believed that Flipman and the 1900 Act unambiguously created that sort of situation. I suppose you'd be obligated to give effect to that. But this court should read statutes in a way that is coherent and doesn't create anomalies. At the very least, I think, whether it's either argument or a simple argument that I've spent most of the time up here actually articulating, I think this exchange was authorized. I know there are other issues in the case, but I'm also way over my time. I think we better stop you. OK. All right. Thank you, Your Honor. Thank you. Good morning, Your Honor. Miguel Estrada for Simplot. I would like to reserve two minutes for rebuttal, if I may. Let me just jump in. We agree with the government that the order should be reversed in every respect. We think Flipman provides a fully independent ground of authority for the exchange. We think, as was explained earlier, that what Congress did in 1976 was to take stock of all of the existing laws after a careful study and provide a definition of public laws that is worthwhile to consider textually. It says, any land or any land interest owned by the United States, irrespective of how the United States acquired ownership. So given that, if that was enough, what was the point of listing a repeal of all of these laws? Many, many, many, many laws listed specifically as having to be repealed. It seems like that would be unnecessary under your first argument. No. And respectfully, I think it is important to keep in mind how the Supreme Court deals with what falls in the category of an express repeal and a repeal by implication. A repeal by implication is things that are done almost by inadvertence, when you cannot make things work together. And it is almost, can these two things essentially occupy the same space? Could Congress have intended this? That's the implication, by necessary implication. And you can go cases like Bashelder, which is one of the leading cases in the criminal law, for example. And oftentimes, the conclusion is that Congress did not intend that such repeals are disfavored. And all that 701F, I believe, in the statute does is to recite the background rule that would apply otherwise, that a repeal by implication is disfavored. Now, let us not forget that Congress repealed a lot of laws in FLTMA expressly, including some of the laws in the 1900 Act. Now, what's going on here is really two things. And I think there are a couple of examples that have arisen in cases that we cite. I'm sorry. I don't understand your answer to my question. What you're saying, the very existence of FLTMA and its statement that this is now taking over all land transfer, is all we need. And if that's true, why is there a list of repealed statutes? No, that's not what I'm saying. What I'm saying is that if you look at cases like Dorsey from the Supreme Court and Amirata Hess, what they tell you is that if the text applies, it is the express application of the text, which if inconsistent with another law, is an express application of the law. And I think you're saying that the general statement in FLTMA that this is going to allow federal land transfer is enough. Yes. And if you believe that's inconsistent with only, we don't. But if you do, then that would be an express repeal of the exclusivity that was implied by only, not an implied repeal. That's my answer. But what I don't understand is if that sentence in FLTMA is actually enough to repeal other laws, why did they list a bunch of laws that were being repealed? It would seem to be totally superfluous. No, I'm saying the opposite with all respect, Judge Freeland. I'm saying that the sentence recites the ordinary rule of interpretation that they're not repealing anything by implication. And the things that they did repeal. No, that's not the sentence I'm asking. You started your argument, I thought, by saying FLTMA says that we are now going, this is, I'm sorry, I don't have the exact language. No, no, no, no, no. Now I understand what you're getting at. No, the sentence that I started with speaks to the scope of FLTMA. Everything that FLTMA covers. And that is what FLTMA applies to. And isn't that what you're relying on to say? Yes, absolutely. OK, so that sentence, if that really is enough to tell us that FLTMA now occupies the field of land transfer, why did they need to list a whole bunch of land transfer laws that were being repealed? Why weren't they automatically repealed by that sentence? Because the fact that the law applies doesn't mean that it displaces other laws that potentially also apply. And that is why the Blackfeet tribe example is an important one. If you recall in that case, there was an original law that was enacted in 1904 that authorized the granting of rights of way for the purpose of building pipelines only in Indian land. Then in 1948, a broader law was passed that authorized the granting of rights of way for any purpose. But with a different approval mechanism. I think in both cases, you had to get the tribe to consent. But the catch was that the 1904 law, you could read as limiting the right of way to 20 years. And the 1948 law to 50 years. Both remained on the books. And both could apply independently. But both were independent sources of authority. And what we're saying here is that it's not unusual in the law for Congress to pass a narrow law and a broader, more comprehensive law. And for the government to have the choice, if both are equally available, to choose the broader, more comprehensive law. OK, so if that's true, and FLTMA is the broader law, and it automatically is going to be in parallel with other laws, why is there a whole list of statutes that Congress bothered to repeal in FLTMA? Because there are reasons to dispense completely with other statutes by repealing, because they're completely unnecessary. There are some statutes that should not be repealed. For example, in this case, the tribes continue to enjoy hunting and fishing rights. If you repeal while the land is owned by the government, if you got rid of the statute, that presumably would go away. And so there are parts of the statute that remain active, so to speak, and that grant rights. That fact, why doesn't that trigger the Indian canons of interpretation? Because Section 5 was not part of the 1898 agreement that was actually negotiated with the tribes. And the reason why the canon does not apply to it, apart from the fact that it was not negotiated for the benefit of the tribes, is that textually, its purpose is to open the land to settlement by non-native American citizens. And there are any number of cases, both from the Supreme Court and this court. The leading case from the Supreme Court, I believe, is the Oregon fish and wildlife case versus the Klamath tribe, where it says that many of these session laws that essentially were intended to open land to settlement, but also gave usufructory rights to tribes, are not solely for the benefit of Indian tribes. In addition, as the government pointed out in its brief, the mere fact that in the particular case, the plaintiff is a tribe, and it's arguing that the outcome in the case favors it, doesn't mean that the interpretation of the law uniformly would favor it. That was my question. Is that the proper use of the Indian canon law? As I understood it, is that you use it if there's an ambiguity on a statute that might impact Indian lands, that you consider in favor of it. I've never seen it used between two statutes to give way, if I'm on the scale of one statute over the other. None of the prerequisites for the application of the canon are triggered here. There is no ambiguity. The statute was not passed for the benefit of a dependent Indian tribe, as the language used by the Supreme Court goes. And so there is nothing here that would trigger the application of the canon. Is it allowed to be used when you're comparing two different statutes? No, usually it has to do with the interpretation of particularly ambiguous statutory language in a statute that you have identified as having passed for the benefit of a dependent tribe. And then in cases of ambiguity. But why wouldn't that then trigger by interpreting only here? It seems like there's ambiguity, according to government, about what only meant. Right, though as I pointed out to you, the particular provision in which only appears was a provision, the purpose of which was to open the land that was formerly owned by the Indian tribe to white settlement. But we started this whole conversation because you were saying the statute also keeps it for hunting. I mean, it does both. No, as I mentioned when I cited the Oregon Fish and Wildlife case, there are any number of statutes, both from the Supreme Court and from this court, that recite the proposition that statutes that provide benefits to Indians and non-Indians are not passed for the benefit of Indian tribes, and therefore are not appropriate for the invocation of a canon. It has to be a statute that is passed for the benefit of the Indian dependent tribe. And this, which was passed for the purpose of opening the land to settlement. And for keeping the land for the tribe in the meantime. But it is the dual purpose that defeats the application of the canon, because it has to be the single purpose of benefiting the Native American tribe that triggers the application of the canon. I have two questions that don't have anything to do with the statutory construction issue that the last 20 minutes have been set on. They both have to do with compliance with FLIPMA. One has to do with valuation, and one has to do with cultural significance. So on the valuation issue, I want to give you a hypothetical, which I don't really think is too far off. I want to take this out of gypsum stacks. Let's pretend I own a Walmart. And I want to expand my Walmart, and there's a parcel next to my Walmart that I really want. And everybody knows I really want it, because I've been trying to buy it for years. But the owner won't sell it to me. Then the owner dies, and somebody else inherits it, and they're willing to sell. And so somehow it goes up for auction. Isn't it a consideration, as a matter of economics, in deciding the fair market value of that property, that everybody knows that I really want it? And that might bring in bidders who might want to bid up the price, because they know that I'll pay a premium price to get it. That was something that wasn't considered, I don't think. What's wrong with that? What's wrong with it is that Congress passed a statute in 1988 that was an amendment to FLIPMA, and was expressly for the purpose of facilitating exchanges of federal land. And based on the problem that is often present in the West, that you have a checkerboard type ownership, and where Congress wanted to facilitate exchanges to consolidate land and make it more uniform. And what the statute does is to have a statutory framework and calls for regulations as to how to conduct appraisals to deal with the value of lands to be exchanged by the federal government. And one of the things it does is that in the 1988 statute, which is now part of FLIPMA, is that the BLM has to take into account the regulations, under the regulations, something called the Uniform Appraisal Standards. Right. And following the decisions of this court, which emphasize that there has to be a market demonstrated for the particular use that is intended. But I think, respectfully, I think you're confusing two different things. You have to consider the highest and best use. You do. But you also have to consider what's the highest and best use worth, right? Those are not necessarily the same question. Highest and best use is the thing that it's going to be used for. Then there's a second question is, what's the value of it? And if somebody can come along and say, I know you really want it, so I'm going to buy it and bid up the price and make money off of arbitrage, isn't that part of fair market value? I'm not sure that I'm fully following your question, because you would have to interact with the government, which is bound by the Uniform Appraisal Standard 410, which says that the intended use by the proposed acquirer cannot be considered, and I'm quoting, unless there is a competitive demand for that use in the private market. And so you're basically saying the question doesn't make sense. Well, no, I'm saying that the government, in promulgating the Uniform Appraisal Standards, has tried to cut off that type of speculation by saying that if the market is not existing already, it's not to be considered. I get your point. Let me ask my other question. The other question has to do with consideration of cultural significance. So as I understand it, there's the record of decision, or the rod, or however it's known in the lingo. The record of decision does not itself talk about consideration of cultural significance. It says, it doesn't incorporate by reference the environmental impact statement, which did. It says, this record of decision is based on consideration of the information from the final environmental impact statement, which to me doesn't sound like an incorporation by reference. It doesn't say we agree with it, just as we considered it. Why does that count as consideration of cultural significance? Let me say three things, starting with this court's ruling in National Parks, which pointed out that under the relevant statute, which I believe is 1716, what the court had to consider was the record as a whole. And National Parks, I believe it's at page 1069, says that that includes both the rod and the environmental impact statement. Now, if you look at the environmental impact statement, and I believe this is at 4 ER 773, there is a detailed consideration of how the government went about ensuring the preservation of those areas of culture. I agree that it's in the environmental impact statement. What you're telling me is that it doesn't also then have to be in the rod. Correct, because that is essentially the holding of what this court did in National Parks. And in addition is the holding of the language of the statute and what the Supreme Court basically said in court's rulings from Vermont Yankee to the Perez case, which is that if you can figure out what the pattern of the decision was of the agency, that is enough to uphold it under Chenery, which is this is an administrative record case. How do we know that they considered it for the FLCMA purpose? Right, and that's what gets us to the chain of reasoning. Because if you follow the chain of reasoning, there was an initial proposal that was not adopted, and we ended up with Proposal B. And one of the reasons for the adoption of the proposal was exactly this cultural reason. And it was that it preserved more culturally significant sites within federal ownership. There was one that was actually within the transfer of land, but there were then these restrictions that were put in for this purpose. And the government also, you know. So wait, you're saying that's part of the FLCMA record? Is that the reason that B was chosen was because of cultural significance? Yes, it is part of the FLCMA record because it is part of the record as a whole, as National Parks pointed out. And that's part of the EIS. And because National Parks made clear that in assessing the FLCMA question, you have to consider both the EIS and the ROD, this is part of the FLCMA record. And that is. Wasn't there like an express incorporation there, though, that we don't really have as clearly here? No, in fact, I think part of what the court was dealing at page 1069 was that it had not been considered at all because everybody had been under the misapprehension that the record was simply the ROD. And the EIS, you know, nobody had even looked at. And so part of what the court did at 1069 was to go out of its way to say, we're not even sure that we agree, were we the decision maker with this assessment, but it was all considered if you consider, you know, the EIS and the ROD together as the record as a whole. That's how it ends up. And under NEPA, we usually have a harmless error standard. Does that apply under FLCMA as well? Well, it applies to all these cases because that comes from the last sentence of the APA 706. And that last sentence says that in giving judgment, you have to, you know, disregard insubstantial errors. And so that will be true here, either under the Perez theory, that if you can ascertain what they were thinking, or because it didn't make any difference, you would have to conclude that, you know, the district court was wrong in essentially nitpicking this aspect of the analysis. Let me be clear. We think the BLM was very careful in analyzing this. And as the district court itself concluded, all of the other elements of the analysis the court concluded were considered. And given that the environmental impact statement makes clear that the agency went out of its way to minimize the cultural impacts by changing the boundaries and imposing deed restrictions, and that it otherwise concluded in the ROD that there were big benefits out of the land transaction, there was nothing essentially left to weigh in high verba because it had minimized all of the adverse effects and it had concluded otherwise that there were significant benefits. So there was no point in writing that sentence out. Okay, we've taken you way over your time. Thank you, Your Honor. I don't think you can both have rebuttal at this point. You've gone way over your time. So someone will get three minutes and you guys can figure out who, and we'll hear from the other side.  Good morning. May it please the court. Monty Gray, Assistant General Counsel for the Shoshone-Bannock Tribes. I also want to acknowledge the presence of our Chairman Lee-Wan Kendoy, as well as our Councilman Todd Appeny are here with us today. We are dividing up, of course, our time, 10 minutes and 10 minutes myself I'll be addressing the 1900 Act, as well as the interplay with FLIPMA as to the 1900 Act. All the other remaining issues of FLIPMA and any other issues are gonna be handled by Ms. Grant. With indulgence of the court, I'd like to give a little bit of a historical background of the setting of kind of what led up to the 1898 agreement. And what we had is about 10 years prior, we had a prior agreement in which the United States was looking at trying to bring a railroad track through the reservation, which already existed. During that negotiation, most of the chiefs and the headmen of the tribes had expressed that they had no desire and they did not want to sell any of their land. In response to those statements, the Indian agent expressed to them, and just wanna make sure I quote this correctly from the transcript, says, if you propose to do as you said, I will pledge you my word, you will see nothing but starvation before you. Then very shortly after that, they took a new poll of what all the chiefs and the headmen said, and they said that they're okay with giving a little bit of land and then the rest of them just said, same set all the way through. I use this as an example to help illustrate the importance of the trust responsibilities of the United States, as well as these canons of construction related to Indians because we were not in an equal negotiating position in these situations. And that's why it's important that they exist and that's why they're important that they're enforced in these settings that include this because what this agreement is in the 1900 Act is actually an amendment of our treaty. It is a portion where in the original treaty we had negotiated for a reservation that was much larger 1.8 million at the time period approximately is what it was supposed to be. And then through two different session agreements, they took away close to about two thirds of that. And so the reason why you probably don't see this as a repeals because it's a session agreement. It's us giving hundreds of thousands of acres, 416,000 approximately to be correct to the United States. If they repealed these session agreements, you're also repealing all the likely their rights to the land that were associated with that. And so what we do have as just a background is that you do have a few amendments where they did amend some of the provisions of 1904. I disagree with their statement that it removed the auction provisions. What you actually see that it states is that it states that now that they've had the auction, those lands are still now subject to entry and that they are still subject to the provisions of section five. It actually confirmed and reiterated that they still had to be subject to the provisions of section five. Then you have the 1926 reversion, which actually directly referenced an act of revised statutes 2455, which is a small isolated lands tract act. That one was repealed by Flipmund. And as I understand it in 1932, they actually applied the Desert Lands Act of 1877, specifically referencing it by statute and name. And it is worth noting that the Desert Lands Act of 1877 is still valid effective law in existence today. It's not been repealed. They can find that at 43 USC 321 at sequence. In addition to that- Do you agree with opposing counsel's description of when the canons are triggered? It seems like he's arguing that this law has a mixed purpose so the canons don't apply. I don't agree with their statement in that. And part of it is actually tied to the, what I've noticed is their lack of acknowledging their trust responsibilities. In their briefs, they don't even reference or get into trust responsibility. But so are you saying that this law is fully for the purpose of the benefit of the tribe or are you saying it doesn't matter because the canons apply either way or both? Both. So what case do you have for the proposition that the canons apply to a mixed purpose law? Do you have a case? This references court to actually the cases cited by the district court in their ruling. First of all, when the first thing that they let out the bat with was trust responsibility. And they noted underneath the Morongo Band versus FAA that recognizes trust responsibility when you have expressed provisions in the statute. The court then went on into page 10 of its decision in which it noted gross venture tribes where it indicated that this also includes compliance with the general regulations and statutes not specifically aimed at tribes. And so that is. Is there any case that uses the canon across statutes? Statutes that are enacted 100 years apart? I cannot tell you that it says across statutes. I can tell you that you have language that references that. But this would be a unique use of the canon? I don't believe so. Because what you have is you have a general law. If it's on a unique canon, then you should be able to tell me where it's been used before this way. Okay, so tribes versus Bryant versus, I'm sorry, it's Bryant versus Itasca, which is 426 U.S. 373 on page 392, which is a 1976 Supreme Court case in which they indicate that statutes need to be, when they're construed, they need to be liberally construed in favor of the tribes. It didn't talk about crossed 100 years of statutes, but it's referencing in general. But this is a unique, I mean, you have to concede this is a unique use of that canon. I don't believe so. Well, if it's not unique, then you should be able to cite me a case that does it. Well, let me explain why. And the reason why is that almost all of these laws that they're relating to with these statutes and the interpretation of these statutes are relating to treaties and agreements with the Indian tribes that are more than 100 years old. And so maybe I come from a different point of view to where I'm all like, this isn't new. These are all relating principally to agreements and acts of Congress that were more than 100 years old. I thought your argument was that the canons apply to interpreting the 1900 Act. And then the question is whether Flipna repealed it, but you have to figure out what it says in order to figure out whether there's a conflict, et cetera. But am I right that you're using the canons to interpret the original Act? It is, the canons are applicable to both Acts, both the 1900 Act and Flipna. So could you apply the Indian canon to a law of general application? Because Flipna is a law of general application, I agree. It is a law of general application, and that's partly tied to the trust responsibilities of the United States. If you look at Flipna, Flipna references Indian tribes more than 250 times in the document. It is specifically acknowledging that it has a relationship with the tribes. It even allows for tribes to be involved in land use planning with them. Then what's the ambiguity in Flipna then? So it says, notwithstanding any of the provision of law, then it allows the exchange of public lands without regard to how the United States acquired ownership. So it's actually, our express position is that there is no ambiguity in either the 1900 Act or Flipna, and that is simply because Flipna has in its savings clause in multiple provisions that are actually worth noting. I think the court highlighted and touched on in the notes under 1701, 701F, that there's no repeal by implication. Do you look at the other ones? You have 701A, which is land use rights are preserved. You have 701C, which talks about classifications and designations related to land that exists at the time of the act are preserved. And you have H, which says that all valid rights existing as to land are at all actions of the Secretary or subject to it. What would have had to have been included in Flipna to make it clear that it applies to what we're talking about here? What would have had to have been included? I believe, very simply, every single one of those sessions, every single one of the sections that I just referenced very much make it clear that the 1900 Act is still valid because what you did have is this. What if they had put in Flipna something that says this is a homestead law? If Flipna said that it, make sure I understand the question. In other words, you've got this only clause in the 1900 Act. It's only homestead, town site, stone and timber, whatever it is, stone and timber, whatever. So what if Flipna had said this is a homestead law? Then would that end this case? If it said it was a homestead law and to be treated as a homestead law, I think that it would not end the case. And let me explain why. First of all, one, would it be able to, would it? If it's not, then there's no way Congress can get around the 1900 Act. Yeah, well, no. Well, let me explain the full extent. I think I can help you understand our side on this one. What you have is that the, if it said it was a homestead provision, then yes, it would satisfy that requirement of the 1900 Act. Still remember, we have the requirement that the parcels cannot be any more than 160 acres, and this is 716, so clearly it exceeds that. Can I just ask this question a different way? If Flipna, it has the list of laws it repealed. If it listed the 1900 Act, you'd be out of luck, right? Correct. So that, I think, is the answer. There's no bar on a future Congress repealing it. It just didn't, is your argument. Well, and let me add a qualifier to that, is that, correct, we would be out of luck in this situation, except if they repeal the Cession Act, plausibly, you can argue that all the land reverts back to the tribes, because they then cancel. So maybe that's a reason why they didn't include it. Why didn't, why can't these two statutes just exist peacefully together? I think they can. I think the harmonization is, obviously, is that you take a reading of the more restrictive approach between the two. In other words, you have to comply with, as the district court said down below, with Flipna. You also have to comply with the 1900 Act. What it indicates is- No, why can't you say you could either dispossess land under the 1900 Act, or you could dispossess land under the Flipna? Well, and I think, if you were to try to say that, you have to ignore the express wording, or the plain text of the 1900 Act. No, you wouldn't. You would just say, you're not dispossessing the land under the 1900 Act. You're saying that just doesn't apply. You're just saying, I'm gonna dispossess the land under Flipna. And respectfully, I'll submit that, when you have the word only at the end of the sentence, and what it is, is that is only, and it's modifying the prepositional phrase that's in front of it. That prepositional phrase that's under it, it says, only under the homestead, townsite, stone, and timber, and mining laws of the United States. Sure. But that's only if you're going to use the 1900 Act to dispossess the land. And what you have is that law says that you can only dispose of that land according to those statutes. Yeah, under that statute. But if there's another statute that just allows you, gives you full authorization to dispose of land, that's irrelevant. No, and I understand the court's question. I think what you have is, when you have a specific law versus a general law, generally, the decisions to that extent usually find that the specific law in point overrides the terms of the general law. That's a plausible argument. And what you have is that those specific terms directly address the land in this section, and therefore, those take precedent over the more general law. We've taken you over your time, so thank you. I think we better turn to your co-counsel. Thank you. Thank you. Good morning. May it please the court, my name is Jill Grant, and I'll be arguing the FLTMA and NEPA claims in this case. And just to set the stage, in this case, the BLM approved a land exchange where federal land right next to the tribe's reservation and of great cultural significance to the tribes was traded for a piece of private land 16 miles away and across an interstate. So I think it really cannot be argued, excuse me, that the exchange just kind of evened out. In fact, the EIS notes that the cultural significance of the land that the tribe is gonna get instead is most likely not as significant to the tribes as the land that they had. In addition, the land that was exchanged and transferred to Simplot was worth millions more to Simplot than the land that the federal government ended up with, and therefore, violated FLTMA's equal value requirement. And starting with the equal value requirement, the federal government, BLM, was required to consider the proposed use, or planned use, in this case, of the land, and that is in this court's decisions in both desert citizens and national parks. That is definitely the most probable use of the land, which is what the FLTMA regulations require. It also happens to be what the regulations and the UAS, or the standards, and the uniform appraisal. But doesn't it require the market value of the highest and best use? It requires the market value, which is defined as being the highest and best use, which in turn means the most probable legal use of the property. That's what the appraiser is supposed to consider under the FLTMA regulations. But there has to be a market for that highest and best use, correct? There has to be an open and competitive market.  There do not need to be other people who want to use the land as a gift stack. Well, how can it be competitive if there's only one buyer? Because with a single buyer whose intent has been known for 30 years, which is how long this exchange has been in the works, and there's been plenty of publicity about it, everybody knows that that's what's going on. So people could just falsely drive up the cost. People can drive up the cost. But they would have to buy it. They can buy it for less and sell it for more because they know Simplet wants it. But that's not, mm. Even the tribes can buy it. The way I look at it is, are you familiar with eBay? Have you ever done an eBay auction? A little, I've not done one, no. I mean, the way it works on eBay is that you could bid for an item, right? And if someone has a complete unique interest in the item, they could bid up to here. But the price they pay is actually what everyone, is the second highest bid, which is gonna be down here. So that's the same thing in this market. If there's one buyer all the way up here that has a unique interest, everyone else is just down here paying the market value, which is basically agriculture for everyone else. But it isn't agriculture because everybody knows that what this land is going to be used for. And that is what the court tells. But that's not a real market. That's just like fake, driving up a fake auction. I don't think it's driving up a fake auction. Because someone would have to pay the price that Simplet's gonna pay in order to, just maybe $10 less to get that value. No one's gonna do that. Why would nobody do? I mean, you don't need to get the full value that Simplet would pay, but you would still hike the value up enough that it would be a lot more than agricultural land. For that matter, Simplet's competitors could have, I mean, there are other phosphate companies in the region, FMC, which is right next door. So they would buy the land in order to harm their competitor? I mean, it's possible. I'm not an economist, but I- Yeah, I just don't think this is right. It's not how markets work. I think that the value that even in individual places on the land does affect the cost of that piece of land. And that is what the court, both the court below and this court in Desert Citizens and National Parks found. And even though in those cases, the court mentioned that there were other, they were both landfill cases and the court mentioned there were other landfills in the region or there were other landfill proposals. That's not the basis for their decision. They only looked at that, the Desert Citizens case looked at that just to make clear that having a landfill was a viable or feasible option. And similarly- In that case, there was a market, right? There was more than one buyer. There wasn't because- Well, the case itself said that there was a market. There was a market in the region the same way here. There's other phosphate companies in the region, but the piece of land- No one's been identified as a competitor to Simplot here. The piece of land at issue- Because isn't it required to be adjacent to whatever? I forget that thing that's holding all the gypsum, whatever- The gypsum. The piece of land at issue in Desert Citizens was almost completely surrounded by the mining company's land, so nobody else could use it. It's a landfill they were gonna use it in that case, right? Nobody could get to it because it was surrounded, so there were not direct competitors in that case. Our opinion said there was a market for it. You might disagree with that, but- In the region. There are other phosphate facilities in the region. There's a Big Bear phosphate facility in Soda Springs, Idaho. There was this former FMC plant. There are- They could possibly use the gypsum from that place and transport it to this location? Even if it's not used for a gypstack, it could certainly be used as some type of industrial waste facility, which is what a gypstack is. It's industrial waste. There are other industrial waste facilities in the region as well. I wanna make sure you have time to get to the question about the incorporation. So can you speak to this issue that they are arguing that the FLIPMA analysis incorporated the NEPA analysis? Oh, NEPA and FLIPMA are entirely different. NEPA is simply analyzing various alternatives to a project in order to determine, looking at the environmental and other impacts from the different alternatives and then deciding which of those alternatives is the best in terms of having the least impacts or adverse impacts. That is not the same as making a public interest determination as to whether a land exchange should go forward. That's a totally different consideration and that's what FLIPMA requires. And the case that was cited as saying that it was the National Parks where it was said that the court looked at both the ROD and the EIS. In fact, the court was reviewing an appeals board decision, not a ROD. And the appeals board looked at both the ROD and the EIS and therefore the court of appeals looked at both the ROD and the EIS. It did not say that the EIS could just be incorporated and that also would go against APA standards for needing to have a reasoned decision and an explanation of what the decision is. And so I think, so your argument is this is an error because it's a different inquiry that didn't happen. And what is your response to Judge Bumate's question about whether harmless error applies? I don't think it was harmless error because cultural resources, first of all, the interests of the local people are listed in both FLIPMA, the statute and its regulations and the regulations specifically say that cultural resources must be considered. And there is case law including the Houdel case that was cited in the context of the 1900 Act that says that all of the factors listed must be considered. What's the difference between the cultural consideration between NEPA and FLIPMA? The cultural, the analysis of the cultural resources in the EIS was thorough and.  It was thorough, I don't think there's any argument that the analysis. But then how are we not harmless error? It's not harmless because BLM didn't even consider it when it made its, it had to do a weighing as to what are the impacts that the different factors in FLIPMA and the regulations have. But if the EIS was thorough, didn't it do that weighing? No, it never looked at cultural resources. It lists the 13 factors that it looked at in the rod and none of them are the tribe's cultural resources. That's the FLIPMA thing. But I think Judge Bumate is saying if they did look at it, if the same government looked at it for purposes of NEPA, why doesn't that show that if we remanded, it would be futile because they would just do the same thing they did with NEPA for FLIPMA? Because the EIS says that the land that the tribes are currently getting does not, most likely does not contain the same value to the tribes as the lands that they're being forced to give up. Your argument is that that is more important under FLIPMA than under NEPA? Well, NEPA didn't make a decision as to whether the land exchange should go forward. It just explained what the impacts were and NEPA found- Because NEPA isn't really an approval, it's just a procedural step. Exactly, exactly. But FLIPMA is the- FLIPMA is supposed to be making a public interest determination, which it did not do. It was not listed in the factors it considered and who knows, perhaps if they had considered that, if that had weighed into their decision, it could have changed the decision. And if we were to agree with you about this argument, would the whole exchange be voided or would we just have like a partial remand to the agency to first look at this? What do we do if we agree with you about this question? I think that the, well, I should start by saying that the normal remedy for violations of the APA, which this is because there was no recent decision-making, is vacator. But we haven't briefed the remedy yet before the district court. That is the piece that was left before this interlocutory appeal was taken. We would argue for a vacator. The test is in Allied Signal and we find not just that decision, but the equal value decision are serious flaws that cannot be remedied, and therefore, a vacator is appropriate, but we haven't argued that. Am I correct, the land has been transferred already? The land has been transferred, but that does not moot the case. The Muckleshoot Court. No, I'm not suggesting it's moot. I'm just wondering what the impact of a vacator would be. Yes, the land exchange would be undone. Oh, you would undo it? Yeah, which has happened before, including in the Muckleshoot case. Thank you. Thank you. So we'll give three minutes for rebuttal to whoever wants to use it. All right, thank you, Your Honor. I have a lot to cover. So let me start with cultural resources. First of all, just as a technical matter, the ROD does discuss cultural resources at ER 126, specifically discusses right before the public interest determination how the preferred alternative in the EIS was structured to minimize cultural resources, and then it made the precise public interest determination demanded by the regulation. But as for whether the EIS could be considered, Judge Cannelli, on the incorporation by reference point, we think it was incorporated by reference. I take your point that based on, in certain contexts, can mean something somewhat different. Think of the much-abused phrase based on a true story, for example. But in this context where you have two agency documents, the point of the ROD is to approve the preferred alternative set forth in the EIS. I don't think there's any question that they agree with it and that was what that language is intended to do. So we think it was harmless error, even if it wasn't. But in any event, I would urge the court not to impose that sort of magic words requirement on, and we think that was, on the Indian canon. We don't think the Indian canon applies here because, among other reasons, this statute was not intended to benefit the Indians. I think that, in Indian tribe, that's true of section five in particular, but it's also true. So the tribe is citing cases that just say statutes have to be interpreted for the benefit of Indians, regardless of whether it was only for that purpose. So I think they do have cases that say that. I think this court expressly rejected that proposition in the Hoonah Indian Association v. Morrison case that we cite in our brief. It has to be passed for the benefit of Indians. Section five, in our view, clearly was not. And even the provision that gave them conditional rights as long as we're in the public domain, there's no dispute that the 1900 Act was intended to dispose of lands according to the broad categories of land. So there's been no broken promise or breach in trust. They got precisely what they negotiated for, which was fixed sums in exchange for Interior's right to acquire and then dispose of this land. Judge Friedman, I want to take one more run at you on the implied repeal point. I mean, the question is not whether Flipma impliedly repeals the 1900 Act, which it doesn't. The question is whether Flipma can be applied. So in terms of what other points that are impliedly repealed, you have the Homestead and Townsite Acts that are impliedly repealed because to leave those in existence could undermine the uniform scheme. Flipma sets up, for example. By contrast, there's no reason the 1900 Act and Flipma can't be operated together. They're simply different sources of authority. Finally, just on the vaguer point, I just want to make clear, the vaguer question in this case is complicated. I don't think that, I think that question is not before this court. I think the harmless error question probably is because that's sort of baked into Section 706 as to whether there has sort of been an error in the first place. I certainly think, particularly as to the cultural resources under the usual allied signal factors, I don't think there's any chance that that would warrant vacature. But in any event, I don't think the remedy issues are before this court. Just one question. Just one question I have. Do you have a response to your colleague's argument that Flipma is a general statute, but the 1900 Act is a specific one, and there is a canon where the specific topic conflicts with a general, we go with the specific. Yeah, so I have two responses to that. First of all, the specific governs the general canon. I think it's usually applied in the case where there's a conflict and two statutes can't coexist. I mean, here, these two statutes can coexist, but I also dispute the premise. I don't think there's any way, yes, the 1900 Act is specific to these lands, but one isn't more specific than the other more generally. I mean, Flipma, the entire point of it was intended to apply uniform scheme, and there's no question that the definition of public lands, which applies regardless of how BLM acquired ownership and contains two exceptions, neither of which apply here, applies. So we think that these two can be applied in harmony, and that's what the court should do in this case. Over my time, I could say something on valuation, but I've already tested the court's patience, so I defer to you all on that. I think, unless you have more questions on valuation, no. All right, thank you, Your Honor. Thank you both sides for the very helpful arguments. This case is submitted, and we're adjourned for the day.
judges: FRIEDLAND, BUMATAY, Kennelly